JEROME R. BOSTICK, Employee, Plaintiff v. KINSTON-NEUSE CORPORATION, Employer, SELF-INSURED/KEY RISK MANAGEMENT SERVICES, Carrier, Defendants

No. COA00-729

(Filed 17 July 2001)

**1. Workers' Compensation— disability—Form 21 presumption—not rebutted by unsuitable jobs**

A workers' compensation defendant did not rebut the Form 21 presumption of disability where plaintiff returned to work with defendant and then worked for his brother's ambulance company, but defendant presented no evidence that a suitable job existed for plaintiff and that he was capable of getting such a job. There was testimony that other employees were instructed to help

BOSTICK v. KINSTON-NEUSE CORP.

[145 N.C. App. 102 (2001)]

plaintiff with manual tasks when he returned to work with defendant, assistance not normally provided for a person holding plaintiff's job, there was testimony that plaintiff's work as an EMT exceeded his physical restrictions and that he could not do the work because of his lifting restrictions, and plaintiff's brother testified that he would not have given anyone else the part time position filing, answering the telephone, and working as a dispatcher in which plaintiff was on his own schedule and stopped working if his arm started to bother him.

**2. Workers' Compensation— cause of injury—conflicting medical testimony**

The trial court erred in a workers' compensation action by finding that plaintiff's left tennis elbow was not caused or aggravated by his compensable right tennis elbow. The Commission chose to give greater weight to the testimony of a doctor who did not state an opinion as to the cause of this plaintiff's left elbow condition and who stated that he would defer to the doctor to whom plaintiff's treatment was transferred on issues which arose after the transfer. That doctor testified that the left elbow condition was the result of compensation for the right elbow condition.

**3. Workers' Compensation— unilateral stoppage of payments—penalty**

The 10% penalty for an unpaid installment of a workers' compensation award was due where defendants never sought permission from the Commission to terminate compensation under a Form 21 Agreement.

**4. Workers' Compensation— attorney fees—unilateral stoppage of payments**

The Industrial Commission was required to address the issue of whether attorney fees were due in a workers' compensation action where defendant did not present evidence to rebut the presumption of disability or to explain why it stopped benefits.

**5. Workers' Compensation— computation of average weekly wage—outside employment**

The Industrial Commission did not err in a workers' compensation action by not including plaintiff's National Guard salary when computing his average weekly wage. A claimant's average weekly wage is computed using only the wages received in the employment in which he was injured.

Appeal by plaintiff from Opinion and Award entered 13 March 2000 by the North Carolina Industrial Commission. Heard in the Court of Appeals 18 April 2001.

*Law Offices of George W. Lennon, by George W. Lennon and Michael W. Ballance, for plaintiff-appellant.*

*Lewis & Roberts, P.L.L.C., by Winston L. Page, Jr., for defendant-appellees.*

HUDSON, Judge.

Plaintiff appeals an Opinion and Award of the North Carolina Industrial Commission (the Commission) denying his request for temporary total disability benefits and determining that his left elbow problems are not causally related to his compensable right elbow problems. We determine that in this case the Commission did not properly apply the presumption of plaintiff's ongoing disability, which arose from a Form 21 agreement to pay compensation for "necessary weeks." Furthermore, its conclusion that plaintiff's left elbow problems are not related to his right elbow injury is not supported by findings of fact which are supported by competent evidence in the record. Therefore, we reverse and remand the case.

In its Opinion and Award, the Commission made findings as follows: Plaintiff began working for defendant-employer in November 1991 as a hydraulic brake press operator. This position consisted of lifting pieces of metal with an electronic hoist, manually adjusting the piece of metal placed on the press, and programming the press so the metal was shaped into forks for the electric pallet trucks which defendant-employer manufactures.

In June 1994, plaintiff began experiencing right elbow discomfort. He sought treatment from Dr. Richard Huberman, who diagnosed lateral epicondylitis, or what is commonly referred to as tennis elbow. When conservative treatment failed, Dr. Huberman performed a right lateral release on 7 December 1994 and allowed plaintiff to return to light duty work on 19 January 1995 with the restriction of no heavy lifting.

On 14 December 1994, the parties entered into a Form 21 agreement with respect to the right elbow which specified that compensation was to continue for "necessary weeks." The Commission approved this form on 10 January 1995, and defendant paid plaintiff

temporary total disability benefits from 7 December 1994 to 18 January 1995.

On 19 January 1995, plaintiff returned to work with defendant-employer. Defendant accommodated plaintiff's restrictions by significantly modifying his position so that he was only required to program the computer and not move heavy pieces of metal. Plaintiff stopped working for defendant on 24 January 1995. He then enrolled in a program to received his emergency medical technician (EMT) certificate and received certification on 11 February 1995. He went to work for his brother's company, Better Health Ambulance Service, on 12 February 1995, as a full-time EMT.

Plaintiff visited Dr. Huberman on 25 September 1995 with complaints of increased pain in his right elbow. Dr. Huberman referred plaintiff to another doctor in his practice, Dr. Andrew Siekanowicz, for soft tissue pain.

Dr. Siekanowicz first saw plaintiff on 19 October 1995; he diagnosed plaintiff with right salvage tennis elbow and prescribed one month of conservative treatment. When this failed, he performed salvage tennis elbow surgery on 5 December 1995. Defendant paid plaintiff temporary total disability compensation from 7 December 1995 to 24 April 1996. Plaintiff returned to work with his brother's ambulance service on 26 April 1996 in a part-time capacity, earning diminished wages. Defendant paid plaintiff partial disability compensation from 25 April 1996 through 19 May 1996 for the difference in his average weekly wages before injury and what he made with his brother's company.

On 24 January 1996, Dr. Siekanowicz diagnosed plaintiff with left tennis elbow. Dr. Siekanowicz testified that plaintiff's right tennis elbow caused his left tennis elbow, in that he was forced to overuse his left arm as a result of the right arm injury. The Commission found that, in the opinion of Dr. Huberman, plaintiff's left elbow problems are not causally related to his compensable right elbow problems, and also found that plaintiff's left elbow symptoms are not the type typically associated with overuse.

Dr. Siekanowicz referred plaintiff to Dr. Nirschl, a doctor in Maryland, when it became apparent that the surgery on the right elbow had failed. On 20 May 1996, Dr. Nirschl performed another salvage tennis elbow procedure. Defendant paid plaintiff temporary total disability benefits from 20 May 1996 to 23 June 1996. Plaintiff

returned to work in June 1996 at his brother's ambulance business earning diminished wages. Defendant paid him temporary partial disability benefits from 24 June 1996 to 9 February 1997. We note the record is silent as to why defendant stopped paying benefits at that time, and, at oral argument before this Court, counsel for defendant was unable to give an explanation for the 9 February 1997 termination. At the time of the hearing before the Deputy Commissioner on 25 August 1997, plaintiff was still employed by his brother in a part-time capacity, working primarily as an ambulance dispatcher.

The Commission determined that plaintiff had not reached maximum medical improvement with respect to his admittedly compensable right elbow. It therefore could not determine whether plaintiff was entitled to benefits for permanent disability. It found that plaintiff was due additional temporary partial disability benefits from 9 February 1997 and continuing for a period not to exceed 300 weeks from his date of injury in accordance with N.C.G.S. § 97-30 (1999). The Commission awarded no benefits based upon the left tennis elbow. Also, it declined plaintiff's request to include the salary he earned by working in the National Guard in computing his average weekly wages and instead used only his salary with defendant-employer. Finally, the Commission concluded that defendants had defended the case upon reasonable grounds and that plaintiff was not entitled to attorney's fees or penalties. Plaintiff appealed the Commission's decision to this Court.

[1] Plaintiff first contends the Commission erred in denying him temporary total disability benefits from 7 December 1994 onward. He argues that defendants never rebutted the presumption of disability which arose from the Form 21 agreement in which defendant agreed to pay total disability from 7 December 1994 for "necessary weeks." We agree.

North Carolina "case law has consistently held that once a Form 21 agreement is entered into by the parties and approved by the Commission, a presumption of disability attaches in favor of the employee." *Saums v. Raleigh Community Hospital*, 346 N.C. 760, 763, 487 S.E.2d 746, 749 (1997). This presumption has its origins in the fact that payment is being made pursuant to an award of the Commission. *See* N.C.G.S. § 97-18(b) (1999); N.C.G.S. § 97-82(b) (1999); Workers' Compensation Rule 404(1); *Watkins v. Motor Lines*, 279 N.C. 132, 181 S.E.2d 588 (1971); *Tucker v. Lowdermilk*, 233 N.C. 185, 63 S.E.2d 109 (1951); *Watson v. Winston-Salem Transit*

*Authority,* 92 N.C. App. 473, 374 S.E.2d 483 (1988). After the presumption attaches, the burden shifts to the employer "to show not only that suitable jobs are available, but that plaintiff is capable of getting one, taking into account both physical and vocational limitations." *Kennedy v. Duke Univ. Med. Center,* 101 N.C. App. 24, 33, 398 S.E.2d 677, 682 (1990). A job is suitable if the plaintiff is capable of performing it "considering his age, education, physical limitations, vocational skills, and experience." *Burwell v. Winn-Dixie Raleigh,* 114 N.C. App. 69, 73, 441 S.E.2d 145, 149 (1994).

In this case, the Commission found as fact that after the parties entered into a Form 21 agreement and payments had begun, plaintiff returned to work with defendant-employer in a modified job. "*[C]apacity to earn* is the benchmark test of disability, so mere proof of a return to work is insufficient to rebut the Form 21 presumption." *Kisiah v. W.R. Kisiah Plumbing,* 124 N.C. App. 72, 81, 476 S.E.2d 434, 439 (1996), *disc. review denied,* 345 N.C. 343, 483 S.E.2d 169 (1997) (emphasis in original). Furthermore,

> [i]f the proffered employment does not accurately reflect the person's ability to compete with others for wages, it cannot be considered evidence of earning capacity. Proffered employment would not accurately reflect earning capacity if other employers would not hire the employee with the employee's limitations at a comparable wage level. The same is true if the proffered employment is so modified because of the employee's limitations that it is not ordinarily available in the competitive job market.

*Peoples v. Cone Mills Corp.,* 316 N.C. 426, 438, 342 S.E.2d 798, 806 (1986).

Four of defendant's employees testified that plaintiff was not required to perform any manual labor in the job to which he returned. Rather, other employees were instructed to help plaintiff with any manual tasks, and plaintiff was limited to operating the computer. Supervisor Darrell Griffin testified that normally there was no such assistance provided for a person holding plaintiff's job. Defendant presented no evidence that the modified position created for plaintiff was one normally available in the competitive job market, as required by the Supreme Court in *Peoples, id.,* and *Saums,* 346 N.C. at 765, 487 S.E.2d at 750. Thus, plaintiff's presumption of disability was not rebutted by his return to work for defendant-employer.

The Commission found that plaintiff thereafter went to work for his brother in an EMT position. Although it is not explicitly stated in the opinion, the Commission appears to have perceived that his taking this job rebutted the presumption of total disability. However, there is no evidence in the record that the EMT job constituted "suitable" employment or that he would have been hired in the competitive job market by anyone other than his brother to perform the job, given his physical limitations.

Plaintiff testified that he asked his brother to hire him for the job as a favor until he could recover from his surgery. Dr. Huberman testified that he witnessed plaintiff performing certain tasks of the job and did not understand why plaintiff was doing it, because it was "as bad on his elbow" as his job with defendant-employer had been. Plaintiff's brother testified that although plaintiff wanted to try to work as an EMT, it was "quickly proved that he could not do it because of the lifting requirements." In conclusion, defendant did not present any evidence that the EMT job was suitable for plaintiff or that he would be able to get such a job in a competitive market, given his physical restrictions. In fact, defendants repeatedly admit in their brief to this Court that the EMT job exceeded plaintiff's physical restrictions. As such, plaintiff's attempt to work as an EMT did not rebut the presumption of disability.

After plaintiff's second surgery in December 1995, he returned to work for his brother in a part-time position performing various duties such as filing, answering the telephone, running errands, and working as a dispatcher. At that point, he had a lifting restriction of no more than two pounds. His brother stated that plaintiff was on his own schedule and if his arm started to bother him, he stopped work. He further testified that he would not give anyone other than his brother such a job. Again, defendant presented no evidence that such a job was available in the competitive market. Plaintiff, on the other hand, presented the testimony of a vocational rehabilitation expert that it was not so available.

In conclusion, in spite of the fact that defendants hired two vocational rehabilitation counselors to work with plaintiff, defendants presented no evidence that a suitable job existed for plaintiff and that he was capable of getting such a job. Therefore, on the evidence presented, we are compelled to conclude that defendants have failed to rebut the presumption of disability and that plaintiff is entitled to continuing temporary total disability compensation from 7 December 1994 onward. Plaintiff has stipulated in his brief and at oral argument

**BOSTICK v. KINSTON-NEUSE CORP.**

[145 N.C. App. 102 (2001)]

that he is willing to deduct from his compensation due the amounts he has earned working for defendant-employer and his brother.

**[2]** Plaintiff next contends the Commission erred in finding that his left tennis elbow was not caused or aggravated by his compensable right tennis elbow. *See Heatherly v. Montgomery Components, Inc.*, 71 N.C. App. 377, 379, 323 S.E.2d 29, 30 (1984) (workers entitled to be compensated for all disability caused by the compensable injury), *disc. review denied*, 313 N.C. 329, 327 S.E.2d 890 (1985). " '[W]here the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury.' " *Peagler v. Tyson Foods, Inc.*, 138 N.C. App. 593, 598, 532 S.E.2d 207, 210-11 (2000) (quoting *Click v. Freight Carriers*, 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980)). Thus, the Commission was required to rely in this case on expert testimony to determine whether plaintiff's right tennis elbow caused or aggravated his left tennis elbow such that the latter became a compensable injury as well.

Dr. Siekanowicz testified that plaintiff's left tennis elbow is "a direct result of the fact that he had to over-use the left upper extremity to compensate for the right upper extremity." However, the Commission determined that plaintiff's left elbow injury was not related to the right, and found as fact:

> Greater weight is given to the opinion of Dr. Huberman over that of Dr. Siekanowicz on the issue of whether plaintiff's left elbow problems are causally related to plaintiff's compensable right elbow problems. In the Opinion of Dr. Huberman plaintiff's left elbow problems are not causally related to his compensable right elbow problems or the result of over-use of his left arm.

An analysis of Dr. Huberman's testimony reveals that he was not explicitly asked to state an opinion, nor did he, as to the cause of *this* plaintiff's left elbow condition. Dr. Siekanowicz was the only witness who did express an opinion regarding the cause of plaintiff's left elbow condition, which arose several months after Dr. Huberman had ceased treating plaintiff. Significantly, Dr. Huberman testified that he would defer to Dr. Siekanowicz on issues which arose after plaintiff's treatment was transferred. Thus, the Commission's finding

giving greater weight to Dr. Huberman on the issue of the causation of plaintiff's left elbow condition is not supported by competent evidence. *See Penland v. Coal Co.*, 246 N.C. 26, 30, 97 S.E.2d 432, 436 (1957) (findings not supported by competent evidence must be set aside).

**[3]** Plaintiff next argues that he is due a 10% penalty under G.S. § 97-18(g), which provides that "[i]f any installment of compensation is not paid within 14 days after it becomes due, there shall be added to such unpaid installment an amount equal to ten per centum (10%) thereof . . . ." In this case, the approved Form 21 constituted an award of the Commission, *see* G.S. § 97-82(b); Workers' Compensation Rule 503, and defendants never sought permission from the Commission to terminate compensation, *see* G.S. § 97-18(b); Workers' Compensation Rule 404. Because the provisions of G.S. § 97-18(g) are mandatory ("there *shall* be added"), we are compelled to conclude that a 10% penalty is due. *See Kisiah*, 124 N.C. App. at 83, 476 S.E.2d at 440 (defendant ceased paying on a Form 21 award without seeking permission of the Commission; penalties under G.S. § 97-18(g) due).

**[4]** Plaintiff also contends he is due attorney's fees under N.C.G.S. § 97-88.1 (1999) for defendant's unreasonable defense of the claim. Defendant did not present evidence to explain why it stopped benefits or to rebut the presumption of disability. Upon remand, the Commission should address the issue of whether attorney's fees are due under G.S. § 97-88.1.

**[5]** Plaintiff finally contends the Commission erred in refusing to include his salary from the National Guard in computing his average weekly wages. The Supreme Court in *McAninch v. Buncombe County Schools*, 347 N.C. 126, 132-34, 489 S.E.2d 375, 379-80 (1997), recently reiterated its holding in *Barnhardt v. Cab Co.*, 266 N.C. 419, 429, 146 S.E.2d 479, 486 (1966), *overruled on other grounds by Derebery v. Pitt County Fire Marshall*, 318 N.C. 192, 198, 347 S.E.2d 814, 818 (1986), that a claimant's average weekly wages are to be computed using the wages received in the employment in which he was injured only. Thus, the Commission did not commit error in declining to include plaintiff's salary from the National Guard in computing his average weekly wages.

In conclusion, we reverse the Opinion and Award of the Commission and remand for findings and conclusions consistent with this opinion.

Reversed and remanded.

Judges WYNN and JOHN concur.