***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to mis-joinder or non-joinder of parties.
4. An employment relationship existed between plaintiff and defendant-employer on December 16, 2001.
5. Plaintiff sustained a compensable injury to his left ankle and right arm on December 16, 2001 and defendants paid for plaintiff's medical treatment following the injury but did not file a Form 60. Plaintiff alleges to have sustained a compensable injury to his left arm on or about September 20, 2004 due to overcompensating for the right arm, which occurred while he was raking a tray of DBS caps with his left arm. Plaintiff contends that the alleged injury to the left arm constituted a natural consequence of the injury to the right arm because he was restricted in the use of his right arm and had to perform the tray raking with his left arm only. Plaintiff alleges that he tried to use his right arm to alternate raking, but it caused too much pain in the right elbow. This job requires the use of both arms.
6. Defendants contend that the alleged injury to the left arm did not constitute a new injury due to overcompensation, that it did not constitute an occupational disease, and that it was not a natural consequence of the injury to the right arm. *Page 3 
7. Plaintiff's average weekly wage was to be determined by a Form 22 and testimony at the Deputy Commissioner's hearing. Defendants submitted an incomplete Form 22 from which plaintiff's average weekly wage cannot be determined.
8. Plaintiff last worked for defendant-employer on January 20, 2005 and plaintiff remains an employee of defendant-employer.
9. In addition, the parties stipulated into evidence the following at the Deputy Commissioner's hearing:
 a. Packet of Industrial Commission forms and filings.
 b. An indexed packet of medical records.
 c. Note by Dr. Fedder dated January 17, 2005.
 d. Note by Dr. Fedder dated January 21, 2005.
 e. Plaintiff's discovery responses.
 f. Defendants' discovery responses.
 g. Job evaluation for injection press operator.
 h. Operator duties as of September 6, 2005.
 i. Employee's report of injury dated December 16, 2001.
 j. Supervisor's accident report dated December 16, 2001.
 k. Wage earning record.
 l. Short term disability employer verification.
 m. Short term disability employee request.
 n. Attending physician's statement.
 o. Faxed letter from Gene Escolas to Sue Thompson.
 p. DBS caps. *Page 4 
 q. Paddle used in plaintiff's job.
 r. DVD with video clips.
10. The Pre-Trial Agreement dated March 28, 2006, which was submitted by the parties, is incorporated by reference.
11. The issues before the Full Commission are whether plaintiff's left shoulder condition in January 2005 was a direct and natural result of his right elbow injury, and, if so, what benefits he is entitled to receive.
 *********** RULINGS ON EVIDENTIARY MATTERS
At the hearing before the Full Commission, defendants sought to enter an Addendum to Hearing Exhibits into evidence, consisting of medical records regarding plaintiff's Charcot-Marie-Tooth Syndrome, and plaintiff objected. In its discretion, the Commission hereby receives into evidence the additional medical records.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 41 years old and began working for defendant-employer in August 1990 as B-2 injection press operator. Defendant-employer manufactures plastic parts such as deodorant canisters, lids and "elevators," which are the parts inside canisters that push deodorant to the top. Plaintiff operated five machines and his duties included periodically checking the quality of the parts produced by each machine, using a "paddle" to rake parts out of the tray and into a carton or "gaylord," which is a very large box three and a half feet square by four feet *Page 5 
high, putting labels on the cartons once they were filled, stacking the cartons eight high or, if a gaylord was being used, sliding it onto a skid and using a pallet jack to pull it away. Raking parts was the task which required the majority of plaintiff's time.
2. On December 16, 2001, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment when he stepped on a cap that rolled out from under one of the machines, causing him to twist his ankle and fall forward to the floor. As a result of the fall, plaintiff sustained a fracture dislocation of his right elbow. He was initially seen in the emergency room where the doctor reduced the dislocation, but was referred to Dr. David Fedder, an orthopedic surgeon, whom he saw the next day. Dr. Fedder reviewed the x-rays, which showed displaced, comminuted fractures of the radial head, and recommended surgery involving replacement of the radial head with a titanium implant.
3. On December 21, 2001 Dr. Fedder and his partner, Dr. Mark Brenner, performed the radial head replacement. On December 27, 2001, plaintiff returned to work at light duty in the office at the plant for a couple of months. He was then sent back onto the production floor to work as a crew leader, where he worked as an assistant to the supervisor. As a crew leader, plaintiff rarely had to operate a press. Plaintiff continued working in that position until September 17, 2002, when Dr. Fedder released plaintiff to return to medium level work.
4. Defendants filed a Form 19 report of injury on December 17, 2001 and a Form 28B statement of benefits paid on July 11, 2002. The Form 28B indicated that it was a final payment even though plaintiff had not yet been given a permanent impairment rating.
5. Plaintiff's arm continued to bother him during the following months and he developed symptoms of numbness in his right hand. Plaintiff did not return to Dr. Fedder until February 18, 2003, when he reported symptoms of paresthesias in his right arm and hand. Dr. *Page 6 
Fedder initially prescribed medication but subsequently referred plaintiff to Dr. Robert Snyder, a neurologist, and then back to Dr. Brenner. Nerve conduction studies performed by Dr. Snyder revealed evidence of bilateral carpal tunnel syndrome, bilateral ulnar neuropathy at the elbows and left radial sensory neuropathy.
6. By July 2003, plaintiff's symptoms improved significantly and both Drs. Snyder and Brenner released him from care. Dr. Brenner removed all of plaintiff's work restrictions and defendant-employer then moved plaintiff back to his former position as a press operator.
7. Plaintiff reached maximum medical improvement with respect to his right elbow injury as of September 12, 2003 and was rated with a 20% permanent partial disability to his right arm by Dr. Fedder.
8. By July 2003, defendant-employer was manufacturing caps for containers of fabric softener, which were called DBS caps. One press machine would make 24 caps at a time every 15 seconds, which was significantly faster than the other parts were made. The gaylord held approximately 3000 caps and filled up in 15 minutes. When the machines made DBS caps, plaintiff spent the majority of his time raking the caps out of the machine, and if he got delayed with a problem, the caps would overflow onto the floor.
9. Plaintiff was right handed and, prior to his injury, used his right hand approximately 80% of the time to rake parts, although he did have to alternate hands because they cramped. After returning to work as a press operator, raking parts was quite painful to plaintiff's right elbow. Plaintiff had to reach as far as he could into the parts tray with a paddle, tilt the paddle downwards and then sweep the parts down the tray toward his body. The paddle was made of a Plexiglas type of material and was approximately three and a half by 18 inches in *Page 7 
size, plus an offset section which extended another two inches from the flat rectangular surface. It weighed at least one and a half pounds.
10. On July 14, 2004, plaintiff saw Dr. Snyder for a neurological evaluation regarding pain and weakness in his legs. The doctor ordered a lumbar MRI to rule out a spinal pathology and concluded that the lower extremity symptoms were due to progression of plaintiff's pre-existing Charcot-Marie-Tooth syndrome (CMT syndrome), a hereditary neuropathy of the peripheral nerves. The condition causes numbness, tingling, muscle weakness and atrophy of the lower extremities and moves progressively upwards, sometimes affecting the upper extremities in its later stages. The disease affected plaintiff from his knees to his feet and to some degree, impaired his ability to walk. Although Dr. Snyder felt that plaintiff should not work at that time, plaintiff was able to keep up with his machines and continued working.
11. Plaintiff began to experience sharp pain in his right elbow associated with raking parts due to the repetitive activity involved and the damage to the joint sustained in his injury and subsequent surgery, so he began primarily using his left hand for the task. After raking parts left-handed for an unknown period, plaintiff's left shoulder began to bother him. In September 2004, plaintiff ran only DBS caps and elevators, which caused him to rake many parts. While raking caps in September 2004, plaintiff's left shoulder became so painful that he told his supervisor about the symptoms and asked for relief. Plaintiff explained that it felt as though something in his shoulder was being torn. Plaintiff and his supervisor then met with the production manager, who was unwilling to provide plaintiff with assistance or move him to a position that did not involve raking parts.
12. By letter dated August 17, 2004 and follow-up letter of September 2, 2002, plaintiff's attorney requested that defendants authorize a re-evaluation of plaintiff by Dr. Fedder. *Page 8 
When defendants did not respond, plaintiff filed a motion with the Commission's Executive Secretary who subsequently ordered defendants to authorize and pay for an evaluation by Dr. Fedder.
13. On January 17, 2005, Dr. Fedder examined plaintiff's right elbow and left shoulder. Dr. Fedder was of the impression that plaintiff had rotator cuff tendonitis with a possible rotator cuff tear in his left shoulder. At his deposition, Dr. Fedder reaffirmed his opinion set forth in his January 17, 2005 opinion letter that plaintiff's right elbow injury caused the overuse of his left shoulder and the resulting left shoulder problem. Dr. Fedder recommended an MRI of the left shoulder to evaluate plaintiff's complaints of pain. Defendants refused to authorize the MRI and, as of the date of the Deputy Commissioner's hearing, plaintiff had not undergone the MRI. Dr. Fedder further stated that the raking of DBS caps during plaintiff's shift, except for breaks, would be the type of activity that would expose him to a greater risk than the public generally for developing the symptoms he observed in plaintiff's left and right arms. Specifically, he stated that he would expect that the repetitious shoulder motion contributed to plaintiff's right elbow and left shoulder conditions. Dr. Fedder also recommended a functional capacity evaluation for plaintiff; however, no functional capacity evaluation was performed.
14. On January 17, 2005, Dr. Fedder restricted plaintiff to work that did not involve use of his left arm or right elbow, and if no work was available, he instructed plaintiff to remain out of work. Although plaintiff was given a helper for a few days, defendant-employer did not provide plaintiff with light work after January 23, 2005. Plaintiff did not return to work in any capacity between January 23, 2005 and the date of the Deputy Commissioner's hearing. As of *Page 9 
the date of the Deputy Commissioner's hearing, plaintiff was still considered an employee of defendant-employer.
15. At his deposition, Dr. Snyder agreed that plaintiff's radial head replacement in his right elbow was a factor in the development of pain caused by repetitive use of his right arm to rake heavier caps. Dr. Snyder testified that plaintiff's CMT syndrome is substantially in his legs and does cause problems with plaintiff's ability to work, however, it does not disable plaintiff from using his upper body to perform work. Dr. Snyder stated that even with CMT syndrome, he would most likely relate plaintiff's symptoms to the repetitive motion of raking parts and that the repetitive motion was a significant contributing cause of pain in plaintiff's left shoulder.
16. The evidence failed to address whether plaintiff sustained a material change of condition with respect to his right arm condition as of January 2005 or whether Dr. Fedder simply disagreed with the prior full work release given by Dr. Brenner. Although the evidence tended to establish that plaintiff was placed at an increased risk of developing shoulder problems due to the repetitive raking of parts as compared to the general public not so employed, there is no claim pending before the Commission for an occupational disease involving the left shoulder. The only issue for determination is whether the left shoulder condition plaintiff developed by January 2005 was a direct and natural result of his right elbow injury.
17. The Commission finds that plaintiff's left shoulder symptoms developed over a period of time as a result of plaintiff using his left arm to do what was previously done with his right arm, combined with the fact that his machines were often making the DBS caps, which ran significantly faster than the other parts. Thus, plaintiff's left shoulder problems were a natural consequence of his right elbow injury. *Page 10 
18. As a result of his left shoulder condition, plaintiff was unable to perform his regular work duties from January 24, 2005 through the date of the Deputy Commissioner's hearing on April 3, 2006 and continuing. Defendant-employer did not offer plaintiff work that was suitable to his capacity during that time. Since defendants denied plaintiff's claim for additional workers' compensation benefits, plaintiff did not receive the medical treatment needed for his left shoulder condition as of the date of the Deputy Commissioner's hearing and, therefore, plaintiff has not reached maximum medical improvement.
19. Defendants defended the claim with reasonable grounds.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On December 16, 2001, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2 (6).
2. Although plaintiff initially reached maximum medical improvement regarding his right elbow injury in September 2003, no findings or conclusions of law are made regarding the amount of permanent partial disability or ongoing wage loss plaintiff sustained after September 2003 due to his right elbow condition, as the parties did not raise those issues or the issue of change of condition in their Pre-Trial Agreement and the evidence therefore did not address those issues. N.C. Gen. Stat. §§ 97-29; 97-31.
3. In a claim for additional compensation for medical treatment, the treatment must be "directly related to the original compensable injury."Pittman v. Thomas Howard, 122 N.C. App. 124, 130, 468 S.E.2d 283, 286,disc. review denied, 343 N.C. 513, 471 S.E.2d 18 *Page 11 
(1996). It is the burden of the injured worker to prove that the injury or condition being treated is causally related to the compensable injury by accident. Snead v. Mills, Inc., 8 N.C. App. 447, 174 S.E.2d 699
(1970). The North Carolina Court of Appeals stated in Parsons v. Pantry,Inc., 126 N.C. App. 540, 485 S.E.2d 867 (1997) that once the Commission has found a claim compensable, a rebuttable presumption arises that the treatment is directly related to the original compensable injury. The burden then shifts to defendant to prove that the medical treatment is not directly related to the compensable injury. Id.
4. In the case at bar, the greater weight of the medical evidence establishes that plaintiff's right elbow condition in January 2005 was causally related to his injury by accident on December 16, 2001. As such, the Parsons presumption applies to plaintiff's right elbow condition and defendants failed to rebut the presumption that the medical treatment is directly related to the compensable injury.Parsons v. Pantry, Inc., supra; Vandiford v. Stewart Equipment Co.,98 N.C. App. 458, 391 S.E.2d 193 (1990); Starr v. Paper Co.,8 N.C. App. 604, 175 S.E.2d 342 (1970). Therefore, plaintiff is entitled to payment by defendants for medical treatment of his right elbow.
5. In addition, plaintiff is entitled to payment by defendants for medical treatment for his left shoulder condition, which was the natural and direct result of the compensable right elbow injury. Overuse injuries are a natural consequence of a compensable injury if there is appropriate medical testimony to link the overuse to the compensable injury. Coe v. Haworth Wood Seating, 166 N.C. App. 251, 603 S.E.2d 549
(2004); Bostick v. Kinston-Neuse Corp., 145 N.C. App. 102,549 S.E.2d 558 (2001).
6. Defendants admitted the compensability of plaintiff's injury by accident on December 16, 2001 by filing a Form 60. However, the Form 60 does not create a presumption of *Page 12 
continuing disability and therefore the burden of proving disability remains with plaintiff. Sims v. Charmes/Arby's Roast Beef,142 N.C. App. 154, 542 S.E.2d 277 (2001).
7. In order to meet the burden of proving disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v.Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001);Russell v. Lowes Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454
(1993) (citations omitted). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms, Inc.,supra.
8. In the present case, plaintiff has not yet reached maximum medical improvement and continues to be incapable of earning his same wages in the same or any other employment. Although plaintiff remains an employee of defendant-employer, defendant-employer did not have work available for plaintiff after January 23, 2005 within his restrictions. Chavis v.TLC Home Health Care, 172 N.C. App. 366, 616 S.E.2d 403 (2005). In addition, even if plaintiff is *Page 13 
capable of some work, it would be futile for him to seek employment due to his work history consisting solely of manual labor, his upper extremity restrictions and his preexisting CMT syndrome. Thus, plaintiff has produced evidence that he continues to be disabled. Defendants did not produce competent evidence that suitable jobs are available and that plaintiff is capable of obtaining a suitable job, taking into account his physical and vocational limitations. Demery v. Perdue Farms, Inc.,supra; Russell v. Lowes Product Distribution, supra.
9. As a result of his compensable right elbow injury and the resulting left shoulder injury, plaintiff is entitled to compensation for temporary total disability beginning January 24, 2005 and continuing until he returns to work or until further Order of the Commission. N.C. Gen. Stat. § 97-29. The evidence of record is not sufficient for the Commission to determine plaintiff's average weekly wage.
10. Plaintiff is entitled to all medical expenses incurred or to be incurred as a result of the compensable right elbow condition and the left shoulder condition that he developed by January 2005, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
11. The defense of this claim was reasonable and not stubborn, unfounded litigiousness and, therefore, plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1. Sparks v.Mountain Breeze Restaurant, 55 N.C. App. 663, 286 S.E.2d 575 (1982).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD *Page 14 
1. Subject to a reasonable attorney's fee approved below, defendants shall pay compensation to plaintiff for temporary total disability beginning January 24, 2005 and continuing until he returns to work or until further order of the Industrial Commission. The compensation rate shall be determined pursuant to the Order below. That portion of this compensation which has accrued shall be paid in a lump sum.
2. Defendants shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of his right elbow and left shoulder conditions, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability.
3. An attorney's fee in the amount of 25% of the compensation awarded is approved for plaintiff's counsel. Defendants shall pay plaintiff's counsel a lump sum from the accrued compensation and shall thereafter pay him every fourth check.
4. In that defendants failed to submit proper documentation concerning plaintiff's average weekly wage and the testimony at hearing was insufficient to determine the average weekly wage, defendants are HEREBY ORDERED to submit a properly prepared Form 22 Wage Statement within ten days from the filing of this Opinion and Award. In lieu of the Form 22, the parties may stipulate the average weekly wage and compensation rate and submit the stipulation within ten days of the filing of this Opinion and Award. The Form 22 or stipulation shall be forwarded directly to Commissioner Mavretic.
5. Defendants shall pay the costs.
 This the 14th day of June, 2007. *Page 15 
 S/_______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________________ CHRISTOPHER SCOTT COMMISSIONER
 S/_______________________ PAMELA T. YOUNG COMMISSIONER *Page 1